Good morning. If it may please the court, I, Ty Schwartz, representing the defendant Ellen Mikal Wilde. I'd like to reserve about three minutes if I may. This morning I'd like to address three issues that were raised in the brief, but I'd like to go in the following order. I'd like to begin with the with the email issue, the witness, Thomas Tuohy, and his testimony about the vanishing or phantom email from Mikal Wilde. Second, I'd like to discuss the excited letterman's statement made to the jogger Mr. Bigelow encountered on the road the morning after the shooting. And third, if we have time, I'd like to address the prior consistent statements which we contend were used to bolster the in-court testimony of Mr. Bigelow and the witness, Mr. Lucas Paz. The Tuohy email was a critical piece of evidence with regard to the element of premeditation and the sixth count against Mr. Wilde. Really? Was it that critical? Excuse me? Was it that critical? That's what the government said when they made their arguments in the district courts. We're looking at it now. I understand. And so I'm just curious because there's some interesting arguments presented here with respect to the email, but ultimately you'd have to show prejudice and it seems like the case here against your client, especially in the surviving folks, in the eyewitness testimony, that seems like a pretty high bar for you to meet. So I wonder if we could work backwards. Sure. There was plenty of evidence of the shooting. There was plenty of evidence regarding the marijuana group, but the question of whether the shooting was actually premeditated, that is whether he fought in advance, was not as clear. And the self-defense defense was put up by the defendant. The defendant testified. The government, in its closing argument, suggested twelve factors that it claimed showed premeditation, but most of those were just recitations of the facts. Surrounding the group. Well, let me tell you what I'm focused on because I just, we have the eyewitness testimony from Bigelow and Lopez Paz. Mr. Wilde admitted that he took guns and cell phones from all three men. Mr. Wilde admitted that he arrived armed and without cash to pay the men. Juarez Madrid was shot in the back in pursuit. Oh, Mr. Wilde did not call the police after the incident. Mr. Wilde disposed of the weapon and cell phone after the incident, and then he texted his girlfriend to say, stop the logs the day of the incident. It just seems that that is, even if you take out the email, considerable and if not overwhelming evidence of premeditation, as well as evidence of other elements surrounding first degree murder. Well, it's not, I don't believe that it's overwhelming, I tell them, at all, because what you have is you have this scenario that's starting a couple days before the actual shooting where things are starting to disintegrate, and the two workers are concerned about whether they're getting paid. They're mad about not having the work out in the sun. They want to leave. Wilde is getting, Wilde testifies that he feels that he's seeing a side of these guys he's never seen before, and he's concerned about what's going on. So he's concerned about the fact that they've got guns, that they've got these sort of wild backgrounds, and he decides to take the guns away. That's certainly consistent with trying to protect himself in terms of what's happening in this disintegrating situation. But was there some testimony that he then gave one of them back the guns? In other words, what is his self-defense story exactly? How did these people without guns endanger him? Or did one of them now have a gun? Well, he thought they had a gun. He thought they had a different gun. That's right. Or a gun. I mean, he testified that he is, he testified at one point that his gun had been stolen from his house, and he was going into a, you know, let's call it, you know, sort of paranoid, somewhat delusional state. But, you know, the... Can I get back to the merits of the evidence question? Sure. This is what I don't understand. Rule 100A seems to have a specific exception for this situation. In a jury trial, the jury determines in accordance with Rule 1004B any issue about whether an asserted writing, recording, or photograph ever existed. Another one produced at the trial or hearing is the original or other evidence the content accurately reflects. So this rule seems to be saying that this sort of thing that you're concerned about does go to the jury. Correct. Right? So the gatekeeping operation appears to be just an ordinary gatekeep operation, i.e., could any rational juror find this? I mean, you at points seem to be arguing for something stricter, and then in your applied brief you were arguing that we have contradictory law. There does seem to be a statement in a recent Second Circuit case, but it just seems flat wrong given this rule. Well... In other words, the rule seems to say that the jury, it is for the jury. Well, let me answer in two ways. Number one, the Huddleston case, which is the principal case on could a rational jury accept the evidence. The Huddleston case says could a rational jury find by preponderance of the evidence. Now, Huddleston doesn't say the court has to find preponderance of the evidence. Huddleston says the court has to ask whether a rational jury could find by preponderance of the evidence. And the district court never made that determination. The district court basically said, I don't know, it's not a credible scenario. And then he said it could go either way. The district judge never said... Well, but I think it's an incident of merit. And then you also argue for an instruction, but it strikes me that this is what juries do. If they don't believe that his story is so, they don't believe that there ever was a writing, then they're not going to rely on it. So it takes care of itself. Well, look, Rule 1008 says it's for the jury to determine. And I would focus on the word determine. The jury here never made a determination. It didn't do anything. It's just you see it the other way. Because it either believes his story or it didn't believe his story. And with regard to the harmlessness, it seems to me that the likelihood that they didn't do it, that has such weak evidence that that's another reason that it was likely harmless. But even assuming that, they still had to consider whether, in fact, it existed or it didn't exist. It seems they had to do that. It was argued to them that it didn't exist, and they had to decide whether it did or didn't exist. And aren't we looking at the instruction under plain error review? Excuse me? Are we not looking at the instruction? Yes. So you're saying it was plain error? Yeah, I'm saying it was plain error because Rule 1008 says a determination has to be made. The jury had no way of telling what to do with this evidence. I mean, the evidence comes in. It's very weak. It's all over the board. First, you know, the evidence is that, two, he destroyed the email. Then, no, he didn't destroy it. Then, Lyle destroyed it. Then somebody else may have destroyed it. Then the bookkeeper may have destroyed it. And nobody knows what the story is. But no determinations have ever been made. But the evidence comes in as any other evidence comes in, i.e., somebody is saying, and the other side is arguing that this is not believable. And then you either believe it or you don't believe it. So I don't understand what would be added by the instruction that says you can either believe it or not believe it. Well, it's like any other piece of conditional evidence where the court instructs the jury, what do you do with, how do you process this particular evidence? Do you just get an instruction that says here are the elements of the crime, where the elements of the crime may have been in a reasonable doubt? Or does the judge tell the jury, with respect to this email, it is your job to determine by preponderance of the evidence whether it exists. And if so, then you can consider it. My argument is that it's not like any other evidence that comes into court because Rule 108. It's a possible difference, I guess, and then I suppose you want to move on to the excited utterance. But I suppose one difference is that this may suggest that the jury has to have, has to be unanimous as to the preponderance. In other words, it can't be that each individual juror goes and does what he wants with this evidence. Is that the difference? There has to be a determination by the jury as a separate unanimous decision as to whether there's a preponderance of the evidence. I think the instruction says in order for you to consider this evidence, you, juror, have to decide that there exists five preponderance of the evidence and then you decide whether there is a reasonable doubt as to the elements of the crime. So you're claiming basically that there's a failure to judge the jury properly, that the preponderance of the evidence is the standard that they have to consider in respect to whether they should consider that particular evidence. Is that failure to instruct is what you're talking about? That's right. And the reason we take instructions as a whole, you know, I was thinking about the fact that we have voluntary dishearings all the time so the judge pre-orders what would be the equivalent gatekeeping function of hearings and that the jury is able to, you know, consider that as well. I mean, it's part of the jury's deliberations. How is that different than the situation? Well, the difference is you've got a Federal Rule of Evidence 1008 which puts an extra layer on this, you know, general admissibility question and that's why to answer, to go back to Judge Berzon and to answer your question, Judge Blount, is that it's not just a question of admissibility. It's because you look at admissibility first under current rules, the 400 series, and then as Huddleston and as the evidence case is, you look to, is there another rule that controls admissibility? And here there is. It's called the Best Evidence Rule and it's in Rules 1004 and 1008. I'm going to run out of time. Yes, I would like to hear a little bit about the assignment. Okay. With respect to the excited litterant, it's not just a statement that he did it or here's how it happened. It's a statement that occurs approximately 12 hours after the fact. Clearly, Mr. Bigelow is excited. He's, in fact, terrified. With regards to the shooting that he's witnessed, but he's had a lot of time to think about it. In fact, he's had an entire evening to think about it and what he ends up telling Mr. Graham, the jogger on the road, takes up about an inch and a half of the transcript and it's a narrative. It's a narrative of what happened. The question is, can you cross-examine a narrative? You can't cross-examine a narrative and that's what this is. And so there's two bases for excluding this statement. And the reason this statement is important, to go directly to the prejudice question, is because Bigelow wasn't the greatest witness. I mean, he was a witness. He was the first witness and he really had to be bolstered. So they used Graham as the second witness, the jogger, to, by means of this narrative, have him repeat the story through Graham. And there's, you can, you know, the defense counsel could cross-examine Graham as to the accuracy of what he heard. The question I have is that I understand the time delay problem. One shift seems to me to be probably longer than any instance. I mean, is there any other case, any case in which an excited utterance was admitted this long after the fact? I guess they're claiming that he was still excited. Well, he was still excited. But the other question is, the narrative, as you're emphasizing, I mean, usually an excited utterance is, in other words, it's not a story. Is there any law in that at all? I mean, any comparators or anything that's like this that was assumed? I could find, I think the closest thing I could find in a comparator, and in my brief, there are a couple of cases that deal with children where, you know, the time gap is a little bit longer. But ordinarily, I mean, this Court has cases where they've found it wasn't an excited utterance when an hour went by, when a person told the story to someone else in the interim here. An utterance is something used for something like, oh, he killed me, or she killed him, or something. It's not a long story. That's right. I mean, here he's retelling the whole thing in capsule form, to be sure. And he's excited. But, I mean, I know a lot of people that are really excitable and really excited. And then he'll go running off like a wild pig up the tree when he sees a car. I mean, this is pretty distinct, I mean, in a unique set of circumstances because of the ongoing nature, was it not? I mean, of his fear. Well, I'm not doubting his fear. We're not doubting his fear. But the fact is that there was such a long interval. I mean, the question is whether it was. Was there really a long interval when that was ongoing? I mean, up to the moment that he saw the jogger, including while he's talking to the jogger, it seems like he's still very afraid and recounting everything that has happened. He's literally spilling it out. And so I just think, you know, it seems a bit of a challenge for you, even though normally I understand what your argument is. But this situation, I think, is pretty distinct. If we accept that, then any time a person is suffering from PTSD, then no. I don't think so because it seems like he was still trying to run away or be away from the defendant, the palantir. Well, and that's going to come in in all sorts of cases. It's going to come in in kidnapping cases. It's going to come in in accident cases. Any case where there's a big gap in time and somebody is very excitable, for good reason, it's going to eat up the exception and hearsay rule. Let me ask you this. There are a lot of facts to see in the time element, the temporal aspects, climbing up a tree, not climbing up a tree, staying in the woods all night. And the district court had all of these facts to consider and made a determination. What's our standard of review as an appellate court? Well, with regard to the interpretation of the hearsay exception, it's denominal. It's a question of law, but if the district court made the correct determination, then it's an abuse of discretion. Well, I think it's an abuse of discretion standard here, under the circumstances of this case, is it not? Under the circumstances of this case, no, because this exception to the hearsay rule is being stretched way out there. Well, you're saying then that it's so stretched that it would be an abuse of discretion. It's a matter of law to make this determination. Exactly. Okay. Your time is up. I'll give you a minute to rebuttal. Thank you. Thank you. May it please the court, Meredith Osborne of the United States, during Wilde's 16-day trial, Wilde admitted that he shot and killed Roberto Juarez Madrid, an undocumented worker that he'd hired to tend his marijuana groom, after Juarez Madrid asked to be paid. Let me start with the excited utterance. Sure. Why won't this swallow up the excited utterance rule? Judge Murilla, this is a unique situation, because, as you pointed out, it's not merely that he was still excited, which Mr. Schwartz concedes, but it was that the event was still ongoing. This is analogous to the event that he talked about. Well, yes, Your Honor, because he was talking about the fact that he was being hunted down by Wilde. And that would presumably be an excited utterance, which could be introduced. But here, what strikes me as unique about the situation is that he is telling an extensive story about something that happened 12 hours before that led to his current situation, but it's not his current situation. And I don't know of any analog to that. I mean, ordinarily, my recollection, and I haven't gone back and looked at it, is that the excited utterance exception is basically, in common law, an extension of the prison sentence impression, and that it has always been understood to be pretty limited to something that is, the whole notion being that you didn't have time to think about it, and it's so spontaneous that it must be accurate. And in here, I mean, whatever else is the case, he had 12 hours to think about it, and what he's recounting is not his current circumstances. No. In fact, he is saying that his first statement to Graham is, they're trying to kill me. That is a prison sentence. Okay, and I think that maybe there's some part of this that is the excited utterance, but the whole tale about how he came to be working there and the guns and so on was not an excited utterance. Let me make an analogy to a kidnapping victim. Let's say that J.C. Dugard, for instance, is the first person that she sees when she manages to escape from her captivity. And she says, I was kidnapped 10 years ago, and I've been held in captivity ever since. This is exactly the same sort of situation. This is the very first person that Bigelow is encountering during a 12-hour ordeal. In fact, his ordeal didn't end until after he spoke to Graham, and Graham returned with the agents and then told Bigelow, these are law enforcement. You're safe. You can come out of the woods now. That's when the startling event ends. Up until then, the startling event, just like the period of captivity, I agree that there is not a case directly on point in the circuit about this, but that is because this is a unique situation. But it's not a slippery slope such that in any case, 12 hours later after somebody was held up, for instance. Not conceptually unique is what you're saying. Yes, Your Honor, exactly. And in fact, if this Court were to hold the opposite, that this was not an excited utterance, then someone like the kidnapping victim would not be able, would never be able to say, I was kidnapped 16 years earlier, and I'm just getting out. I'm going to testify, but that's not what this is about. This is about whether this statement, out-of-court statement to someone else could come in. I would also say that this testimony was not a long story. It covered about two pages of testimony. It was several lines over the course of a 16-day trial. So, again, I think this was already pointed out by Judge Block, but the standard is an abuse of discretion. And in addition, Bigelow testified to all of this himself. So there's no larger concern about him not being cross-examined about it. And so, and then, as you pointed out, Judge Brezon, some of it would probably come in under the presence of suppression. So that even narrows down the amount of testimony that we're talking about further to simply several lines. So this was not a 20-minute long conversation that he was recounting here. This was a quick, help, get me help, I'm being hunted down, I've been hunted down all night, and I'm not coming out until I see you with a police officer coming to get me assistance. He says that at ER 14. So this is a very short statement that he's making. Can you talk a little bit about the prior consistent statements? This is what I couldn't quite understand. The fact that he was, I understand your basic argument to be that by pointing out that he had, that these people had immunity, that they were challenging their credibility, and the question is whether that was a recent, whether he was accused of a recent fabrication. Is that basically right? Yes. I mean, I think there's two reasons that this came in. The first being that they were both cross-examined about their, Bigelow about the immunity that he was given to testify in the State Court preliminary hearing, and Lopez-Paz about the youth visa application that the government made on his behalf. And then also because Bigelow was cross-examined extensively using his prior consistent statements, the statement that he made, the statements that he made both on the day after the shooting and. . . Yes, it seems fairly straightforward. But as to the other, they're getting immunity because. . . I have a hard time linking up the immunity with an accusation of fabrication. In other words, once they're getting the immunity in order so that they will testify, rather than not testify, but, and there's some implication that they might have, in order to get the immunity, have courage to favor with the government by telling a story that the government liked. But it's not the immunity itself that's creating the problem. It's whatever they said to get the immunity.  The granting of immunity is, in almost every case in which I've seen that it's come up, it's being used to raise an implication that the witness is testifying on the government's behalf. And that's what this Court has said. But the immunity itself is not the time when any fabrication would have occurred. That's the only point I'm trying to make. They're trying to figure out when, at what point the notion. . . Well, they had reasons to lie from the beginning. And the same reason they had to lie from the beginning is the same reason that they would have lied to get the immunity. But it's not the immunity that's the lie. I think I understand your question to be about the claim that because they. . . Because time. Yes, Your Honor. But if we were to go back and say that they had an incentive to lie from the moment that they encountered law enforcement immediately after the shooting, because that's when the statements, the statements right after the shooting were given, that would be contrary to this Court's cases that we cited in Bowe and Kulika, which says that there has to be some law enforcement action, that not just a mere hypothetical concern about. . . Is it your position that whenever somebody is granted immunity, that opens the door to allow practices and statements to be placed in evidence? Only if they're questioned about that. Only if they're cross-examined about that at trial. Well, they're always. . . I guess they're always questioned about the fact that they were granted immunity, right? And I assume that the normal questioning is as a result of that. You know, you're telling the truth or you're not telling the truth. That's the normal type of questioning that happens in just about any case where there's a grant of immunity. And your position is that once there's any questioning of that nature at all, it opens the door to prior consistent statements being the truth instead of evidence. I just want to get clarification on what your position is. Yes, Your Honor, and I believe that that's what this Court said in U.S. v. Allen. You say Allen is the precedent that says that just questioning somebody to get back the grant of immunity was slight. It will open the door to prior consistent statements to be placed in evidence. You say Allen stands to that proposition? Yes. I mean, in Allen, this Court said this is the classic situation in which evidence of a prior consistent statement is allowed into evidence. Just the fact that there's any question at all posed in witness that you testify under a grant of immunity is sufficient to allow that? Would you need more than that? Yes, and, Your Honor, yes, and here there was more. But, yes, that is an implication. And the rule itself says that any express or implied motive to fabricate. And so the grant of immunity is an implication by the defense that the witness has been granted something by the government. But nothing here than just the fact that it was brought out at the trial that he's testifying under a grant of immunity, your position would be that that would allow for the prior consistent statement to be in evidence. I just want to get clarification as to what your position is. Yes, Your Honor, but this Court does not need to make such a broad finding here because there was extensive cross-examination. You say yes to the answer that you answered, but in any event you say there's more here than just questioning about the fact that you're testifying under a grant of immunity. What else was there? Well, with Lopez Paz, Wilde impeached, and that's the statement that came in at the state preliminary hearing. Wilde impeached Lopez Paz with the government's application for a U visa and Well, in that, in Bigelow's case, he was extensively impeached with the statements themselves based on consistency. So this Court doesn't even need to decide whether or not those statements properly came in. He was questioned extensively about the grant of immunity is what you're saying, right? No, Your Honor. What I was saying that he was cross-examined with the statements themselves. They were actually introduced by the defendant on pieces of them. But then they were heavily redacted by the district court. So the district court didn't just blanket introduce all the statement. And if you, if this Court goes back and looks at those statements, those are at ER 845 and 847, they are heavily redacted by the district court to focus on the testimony that he was impeached with. So the immunity event tactics to develop a chance for a new sentence, right? Yes, Your Honor. You're saying that you had the actual statements that the defense attorneys were introducing on top, or in addition, they had, there was a reference to the immunity grant. Both, yes, Your Honor. So these came in under both of the exceptions here. And then with Lopez-Paz, there, was there, I can't remember, was it immunity and a U visa or just the U visa that they were challenging? It was just the U visa and the paid for his room and board as well. I see I'm almost out of time. I have a question for you, if I may. Yes, please. Do you think that the judge should, as a matter of law, instruct the jury that they have to make that finding in terms of the abysmal immunity bill by preponderance of the evidence that was not done here? Do you think that the judge should have done that and that was required? No, Your Honor, but I would also point out, and thank you, because I wanted to make sure to point out that this court, that the district court did give jury instruction number 11, which is about statements of the defendant. And jury, in that, jury. But the judge never, because I have it wrong, did say that the standards were preponderance of the evidence and there's no charge of that nature. No, but the district court said, you have heard the testimony that the defendant made in a statement. It is for you to decide, A, one, whether or not the defendant made the statement, and two, if so, how much weight to give it. And so, although that doesn't say the magic words, preponderance of the evidence, the district court did instruct the jury on how to consider statements made by the defendant, and there were numerous. This was not the only admission that was testified to during the trial. There's also a difference, although Mr. Schwartz does not argue it, that what 108 actually says, but in a jury trial, the jury determines any issue about. Does that mean that the jury as a whole has to separately decide that by preponderance of the evidence, rather than having each juror taken into account while they're voting? Because presumably at that point, you could have different jurors coming to different conclusions, some of whom rely on this and others of whom don't rely on this, but rely on something else. I was thinking about that when you asked Mr. Schwartz about that, and it occurred to me that that, that this Court has never, certainly can't be plain error because this Court. It's what it says, doesn't it? Yes, that the jury must decide. If the jury has to determine something, you usually meet as jurors. But then a special verdict form would be required every time that the best evidence rule was applied. I don't think that there's any precedent for that in this Court. Personally, if I weren't signing it flat out in this, that's what I would say because that's what it says. The jury determines. But that's, no, Your Honor, I wouldn't say that that's what that means. The jury determines this just like any other fact, and there are lots of facts in a jury trial that the jury need not decide. You know, for instance, predicates to certain offenses, the jury may not agree about what gun was possessed by a convicted felon, and yet they can agree to convict somebody of being a felon in possession of a firearm. So requiring jury unanimity as to this particular thing, I think would be inconsistent with this Court's other case law. But then there would sort of be no purpose for the sentence because the, I mean, as I was initially saying, I mean, usually if evidence comes in, the jurors say, you know, I believe that guy, I don't believe that guy, I don't think this ever happened, you know, and then they come to a joint conclusion that seems to be saying there's something special about this. I disagree. I don't read the rule the same way. What applications do you have then? Just the same application that this Court has said in Huddleston and Evans and that the district court applied, that a reasonable jury could decide that the email containing the statement existed. And I just wanted to not do that. That's true, but anyway. I see that. A reasonable jury could decide it, but the question is, did the jury decide it, or did just some people decide it and other people not decide it? That's the difference. Anyway, go ahead. I see I'm out of time. A reasonable juror and a reasonable jury. I think I understand what you're saying, but I disagree that there's been any requirement ever that such a special verdict be required for a predicate fact, whether under Rule 104A and B or under Rule 100A. And I would just point the Court to the district court's finding at ER 3 and 661 where it applies the correct standard under Huddleston, contrary to what Mr. Schwartz said in his argument. If there are no further questions, I would ask this Court to affirm. I did have one question. Why did it take so long to bring this case forward? I admit that I'm not sure that I know exactly why, but this was a case that was adopted from the local authorities, and this is a murder case, so it is necessarily a ---- He was arrested in 2010, not died until March of 2012, and then ultimately convicted and sentenced in spring of 2015. Yes, Your Honor, that's correct. Okay. Thank you very much. We're out of time. Mr. Schwartz, would you like to make your rebuttal? Thank you. I want to go to the prejudice from the exciting deterrence from Mr. Bigelow and the prior consistent statement of Mr. Bigelow. Both of these, the entry issues, go to the same witness, and this witness was Bigelow, who was the only eyewitness, in addition to Lopez Paz, who was the fellow who was shot. Again, this is critical testimony. This was the first witness for the government, and a little shaky, and he was the last witness for the government. And the reason I say he was the last witness and the last words that the government heard, that the jury heard before it started to deliberate, were an assistant U.S. attorney reading the prior statement that Mr. Bigelow had given at the time that he went to the fire station. So the fact that this evidence came in as both an excited utterance and as a prior consistent statement really bolstered this key witness and really bolstered the prosecution's testimony against Mr. Weil, and that goes to all other counts with the exception of one and two, which are the marijuana distribution and conspiracy counts. I wish I could debate all day about the emails and the evidence throughout a time, and thank you very much. Thank you very much. Thank you both for your arguments. United States v. Weil, just a minute.
judges: Berzon, Murguia, Block